IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BARRY SHAFFER and**<br>**KIMBERLY SHAFFER,** | : | |
| | : | |
| **Plaintiffs** | : | **Civil Action No. 1:13-cv-01837** |
| | : | |
| **v.** | : | |
| | : | |
| **STATE FARM MUTUAL**<br>**AUTOMOBILE INSURANCE CO.,** | : | |
| | : | **The Honorable Sylvia H. Rambo** |
| **Defendant** | : | |
| | : | |

## M E M O R A N D U M

In this civil action, Plaintiffs have sued Defendant, their insurance carrier, asserting breach of contract (Count I) and bad faith (Count II) claims arising out of Defendant's handling of Plaintiffs' underinsured motorist claim. (*See* Doc 1.) Presently before the court is Defendant's motion for partial summary judgment, wherein it seeks judgment on Plaintiffs' bad faith claim. (Doc. 29.) For the following reasons, Defendant's motion will be granted.

## I.       Background

### A.       Facts

The instant claim arises from a request by Plaintiff Barry Shaffer ("Plaintiff") for underinsured motorist ("UIM") benefits against his insurance carrier, Defendant State Farm Mutual Automobile Insurance Company ("Defendant"), stemming from a motor vehicle accident that occurred on September 5, 2008. (Doc. 31, ¶ 4.) Plaintiff is a 45-year-old veteran who served during the 1980s and 1990s and has a history of physical ailments, which are documented by extensive medical

records dating back to nearly a decade before the collision underlying this action occurred.  (*See* Doc. 32, pp. 17, 22–27 of 33.)

      At the time of the collision, Plaintiff and his wife, Kimberly Shaffer (collectively "Plaintiffs"), were insured by Defendant under an automobile insurance policy—number 23 2135 C15 38F—that provided for, *inter alia*, medical payments coverage and $100,000.00 UIM coverage.  (*See* Doc. 31, ¶ 5.)  The policy provided "stacked" UIM coverage, yielding total UIM coverage of $200,000.00.  (*Id*.)  The UIM policy provided coverage as follows:

> [Defendant] will pay compensatory damages for bodily injury an insured is legally entitled to recover from the owner or driver of an underinsured motor vehicle.  The bodily injury must be: (1) sustained by an insured; and (2) caused by an accident that involves the ownership, maintenance, or use of an underinsured motor vehicle. [Defendant] will pay only if the full amount of all available limits of all bodily injury liability bonds, policies, and self-insurance plans that apply to the insured's bodily injury have been used up by payment of judgments or settlements, or have been offered to the insured in writing.

(Doc. 38, p. 28 of 48.)  The policy also provided that:

> The insured and [Defendant] must agree to the answers to the following two questions: (1) [whether] the insured [is] legally entitled to recover compensatory damages from the owner or driver of the underinsured motor vehicle [and] (2) if the insured and [Defendant] agree that the answer to [the foregoing question] is yes, then what . . . the [proper] amount of . . . compensatory damages [is] that the insured is legally entitled to recover from the owner or driver of the underinsured motor vehicle.

(*Id*.)

      On September 5, 2008, Plaintiff was involved in a two-car collision in Dauphin County, Pennsylvania, in which the other driver, Tina Kresge, was primarily at fault.  (*See* Doc. 31, ¶ 4.)  Plaintiff reported the incident to Defendant on

September 6, 2008.  (*Id.* at ¶ 6.)  On September 8, 2008, Lynda Holl ("Holl"), a medical payments claim representative, spoke with Plaintiff regarding the collision and his injuries and treatment.  (*Id.* at ¶ 6.)  The collision was head-on and caused Defendant to declare that Plaintiff's vehicle, a 2003 Toyota Sienna, was a total loss, for which Defendant issued payment to the lienholder to completely discharge the loan.  (*Id.* at ¶ 9.)  Plaintiff also communicated to Holl that he had an extensive medical history due to his prior military service, which caused the claim to be flagged for review to determine if the medical treatment he was receiving was related to the motor vehicle accident.  (*See* Doc. 30-1, p. 15 of 74.)

Over the next several months, Defendant wrote numerous letters to Plaintiff regarding the claim.  For example, on September 8, 2008, Defendant acknowledged Plaintiff's claim for medical benefits and forwarded an application for benefits and an authorization for release of information, which Defendant requested that Plaintiff return with Plaintiff's medical bills.  (*Id.* at p. 23 of 74.)  On October 21, 2008, Holl informed Plaintiff that Defendant still had not received any medical bills.  (*Id.* at p. 30 of 74.)  On November 4, 2008, Plaintiffs' counsel advised Defendant that he had been retained to represent Plaintiffs and requested that Defendant forward to Plaintiff several documents related to the handling of Plaintiff's first-party claim for medical benefits.  (*Id.* at p. 32 of 74.)  The following day, Holl sent Plaintiffs' counsel a letter acknowledging the representation and informing Plaintiffs' counsel that Defendant had received neither an application for benefits nor any medical bills on Plaintiff's behalf.  (*Id.* at 37 of 74.)  Additionally, Holl forwarded to Plaintiff another application for benefits and an authorization for

release of information.  (*Id.*)  On November 10, 2008, Holl provided Plaintiff with a certificate of coverage for Plaintiff.  (*Id.* at p. 39 of 74; Doc. 31, ¶ 14.)

On November 19, 2008, Plaintiff submitted a completed application for benefits and requested that Defendant place the enclosed bills in line for payment.  (Doc. 31, ¶ 15; Doc. 30-1, p. 41 of 74; Doc. 35, ¶ 15.[1])  The application for benefits set forth Plaintiff's injuries as follows:

> Cervical spine sprain/strain, distended eye lenses and vision has been effected requiring glasses, severe light sensitivity, bruising around eyes & on knees, impact to knees.  Lots of neck & back pain.  Much worse than condition prior to accident.

(Doc. 39, p. 5 of 51.)  The application for benefits further set forth that Plaintiff had received medical care after the motor vehicle accident for his injuries and that he anticipated further medical bills.  (*Id.* at p. 6 of 51.)

On January 8, 2009, Plaintiff requested from Holl a first-party payment summary showing the bills that had been paid for Plaintiff.  (*Id.* at p. 43 of 74.)  Holl responded that Defendant had not received any of Plaintiff's medical bills, to which Plaintiff responded that he had been receiving treatment from the Lebanon Veterans Affairs Medical Center.  (*See id.* at p. 45 of 74; Doc. 38, p. 21 of 50.)  On March 4, 2009, Holl sent Plaintiffs' counsel a letter expressing that Defendant intended to stay up-to-date on Plaintiff's treatment and forwarded to Plaintiff another authorization, which Plaintiff signed and returned.  (*See* Doc. 30-1, p. 47 of 74; Doc. 38, p. 10 of 58.)

---

[1]  In his answer to the statement of facts, Plaintiff states that "[t]he bills submitted with the application were for treatment to Barry Shaffer's eyes."  (Doc. 35, ¶ 15.)

Over the next three months, Plaintiffs' counsel wrote several letters to Defendant's subrogation unit. (Doc. 30-1 at p. 49, 51 of 74.) These letters inquired about the status of Defendant's subrogation claim and the results of an intercompany arbitration that took place on May 5, 2009. (*Id.*) Plaintiff was informed that the arbitration panel did not award damages to either side. (*Id.* at p. 53 of 74.) On August 31, 2009, Holl again sent Plaintiffs' counsel a letter expressing that Defendant intended to stay up-to-date on Plaintiff's treatment and forwarded to Plaintiff another authorization, which Plaintiff signed and returned. (*Id.* at p. 55 of 74.)

On September 10, 2009, Plaintiffs' counsel wrote a letter to Holl advising her that Plaintiff may require back surgery. (*Id.* at p. 57 of 74.) To this point, Plaintiff had only required conservative medical treatment and had not expressed an intention to initiate a UIM claim. (*See id.* at pp. 14–21 of 74.) On April 30, 2010, Plaintiffs' counsel informed Defendant that Plaintiff had undergone surgery. (*Id.* at p. 61 of 74.) Plaintiffs' counsel further informed Defendant that a copy of the bill for the surgery would be sent to Defendant and requested that Plaintiff be advised if his medical coverage was close to being exhausted. (*Id.* at p. 55 of 74.) On May 5, 2010, Plaintiffs' counsel and Holl discussed the remaining medical coverage and, for the first time, expressly discussed a potential UIM claim. (*Id.* at p. 16 of 74.) Holl forwarded a copy of Plaintiff's payment log to Plaintiffs' counsel two days later. (*Id.* at p. 63 of 74.) On June 4, 2010, Plaintiffs' counsel stated that he would inform Defendant if a UIM claim became necessary. (*Id.* at p. 17 of 74.) After several months of silence, Defendant closed Plaintiff's medical payments file on December 10, 2010, noting that the date on Plaintiff's last treatment

bill was September 13, 2010 and that medical records indicated that Plaintiff's back surgery had been successful.  (*Id.* at p. 18 of 74.)

On April 6, 2011, Plaintiffs' counsel requested that an underinsured motorist adjuster be assigned to his claim.  (*Id.* at p. 67 of 74.)  Almost a week later, Plaintiffs' counsel informed Defendant that Kresge possessed $100,000.00 in liability coverage and that a settlement between Plaintiffs and Kresge could potentially occur.  (*Id.* at p. 69 of 74.)  Plaintiffs' counsel requested Defendant's consent to settle.  (*Id.*)  On April 13, 2011, Holl referred Plaintiff's claims file to Defendant's UIM department.  (*Id.* at pp. 18–19 of 74.)  UIM claims representative Scott Whiteside ("Whiteside") was assigned to the claim.  (*Id.*)

Immediately after being assigned to the claim, Whiteside called Plaintiffs' counsel to discuss Plaintiff's claim and initiated a search to determine Plaintiff's prior injuries and Kresge's assets.  (*See id.* at p. 71 of 74.)  Whiteside was informed of a possible settlement between Plaintiffs and Kresge, to which Defendant would be entitled $100,000.00 due to its subrogation rights.  (*Id.*)  Whiteside requested authorization to review Plaintiff's first-party medical file, but Plaintiffs' counsel failed to grant such authorization.[2]  (*See id.* at p. 73 of 74.)  On April 25, 2011, Whiteside provided Plaintiffs with consent to settle with Kresge and waived its subrogation rights.  (*Id.* at p. 36 of 65.)  Subsequently, Plaintiffs settled their claim with Kresge for $72,500.00.  (*See id.*)

---

[2]  On or about April of 2011, Defendant changed its policies to require that an insured's consent be obtained before a UIM adjuster could access information within a medical payments file.  (*See* Doc. 30-2, p. 9 of 65.)  Defendant, however, failed to inform Plaintiffs of this change in policy.  (*See id.*)

Over the next several months, Whiteside and Plaintiffs' counsel remained in close contact.  On May 31, 2011, Whiteside sent a letter to Plaintiffs' counsel concerning the status of Plaintiff's injuries,  requesting Plaintiff's medical records, and again asking for authorization to review Plaintiff's first party medical file, to which Plaintiffs' counsel again did not respond.  (*See id.* at p. 38 of 65.) After Whiteside sent a similar letter to Plaintiffs' counsel on July 21, 2011, Plaintiffs' counsel granted Whiteside verbal permission to review Plaintiff's first party medical file.  (*See id.* at p. 40 of 65.)  On September 14, 2011, Plaintiffs' counsel provided Whiteside with over 800 pages of documentation, including medical records both predating and postdating the motor vehicle accident and photographs of Plaintiff's injuries, to which Whiteside requested more documentation regarding Plaintiff's vision, including a vocational report and records to confirm that any vision problem was causally related to the accident.  (*Id.* at p. 48 of 65.)  On November 7, 2011, Plaintiffs' counsel forwarded to Whiteside additional medical records and indicated that further documentation was being gathered.  (*Id.* at p. 50 of 65.)  On January 27, 2012, after receiving another letter from Whiteside requesting more documentation, Plaintiffs' counsel provided Defendant with a vocational report.  (*See id.* at pp. 54, 57 of 65.)  Plaintiffs' counsel also opined to Whiteside that the value of Plaintiff's claim exceeded $200,000.00 and requested that Defendant tender $100,000.00, the amount of one of the policy limits.  (*Id.* at p. 57 of 65.)

Following the receipt of the vocational report, Defendant hired Kevin Rauch ("Rauch") to assist with Plaintiff's claim.  (Doc. 30-3, p. 19 of 48.)  On February 24, 2012, Rauch informed Plaintiffs' counsel that he represented Defendant

and requested that a demand letter be sent when available. (*Id.*)  On March 16, 2012, Plaintiffs' counsel sent Rauch a demand for $250,000.00.  (*Id.* at pp. 21–22 of 48.)  On April 12, 2012, Rauch expressed a desire to obtain Plaintiff's statement under oath. (*See id.* at p. 24 of 48.)  Additionally, Rauch sent to Plaintiffs' counsel authorizations to obtain records from five medical facilities, which Plaintiffs' counsel forwarded to Plaintiff despite his contention that the records had previously been provided to Defendant. (*See id.* at pp. 24, 26 of 48.)  On June 5, 2012, Plaintiffs' counsel sent all of the signed authorizations to Rauch, and, two days later, sent more pre- and post- accident medical records. (*See id.* at pp. 32, 34 of 48.)  The authorizations were sent to Litigation Solutions, a professional record procurement company, to obtain Plaintiff's medical records. (*Id.* at p. 36 of 48.)  Over the next several weeks, copies of all medical records obtained through the authorizations were sent to Plaintiffs' counsel. (*Id.* at pp. 40–44 of 48.)  On June 12, 2012, Plaintiff gave his statement under oath and signed an additional medical authorization. (*See id.* at p. 38 of 48.)

On September 14, 2012, Plaintiffs' counsel informed Rauch that Plaintiffs were becoming frustrated at the delay in settling their claim. (*Id.* at p. 46 of 48.)  Plaintiffs' counsel further informed Rauch that Plaintiffs were withdrawing their previous settlement demand, indicating that Plaintiff had additional injuries that he wished to be considered in his claim. (*Id.*)  On November 5, 2012, Plaintiffs' counsel informed Rauch that Plaintiff, who had received more authorizations, objected to signing the ones that allowed Defendant access to medical records regarding HIV/AIDS status, drug and alcohol treatment, and psychiatric and psychological treatment. (*Id.* at p. 48 of 48.)  After amended authorizations were

sent, the authorizations were signed and returned to Rauch, which were in turn forwarded to Litigation Solutions.  (*See id.* at pp. 4–12 of 33.)  After Plaintiffs' counsel requested Defendant's position regarding settlement, Rauch stated that the Defendant continued to evaluate Plaintiff's claim with a view toward providing an offer of settlement.  (*See id.* at pp. 6, 8 of 33.)  On April 8, 2013, more medical records received from Plaintiff's signed authorizations were sent to Plaintiffs' counsel.  (*Id.* at p. 14 of 33.)

On April 29, 2013, Dr. Craig Fultz ("Fultz"), an orthopedic surgeon retained by Defendant, issued a report following a review of Plaintiff's medical records.  (*Id.* at p. 16 of 33.)  In his report, Fultz opined that only four of Plaintiff's medical diagnoses could be attributed to the motor vehicle accident.  (*Id.* at p. 29 of 33.)  These diagnoses consisted of: (1) neck pain; (2) chronic low back pain; (3) chronic bilateral knee pain; and (4) vision difficulty.  (*Id.* at pp. 28–29 of 33.)  Fultz further opined that Plaintiff's chronic low back pain, which existed prior to the accident, was not materially or substantially changed by the accident and would have inevitably led to the back surgery that Plaintiff underwent.  (*Id.* at p. 29 of 33.)  Fultz also opined that Plaintiff's bilateral knee pain was not materially or substantially changed by the accident.  (*Id.*)  On May 20, 2013, Rauch forwarded this report to Plaintiffs' counsel.  (*Id.* at p. 33 of 33.)

After Defendant procured Plaintiff's extensive medical records, obtained Plaintiff's statement under oath, and arranged for Fultz to review Plaintiff's medical records, Defendant completed its evaluation of Plaintiff's claim.  (*See* Doc. 30-1, p. 21 of 74.)  On May 20, 2013, Defendant set a reserve range of Plaintiff's claim of $0 to $40,000.00.  (*Id.*)  Subsequently, Defendant offered Plaintiffs a

$10,000.00 settlement offer, which Plaintiffs rejected.  (Doc. 41, p. 50 of 50.)  On May 20, 2014, Stuart J. Setcavage ("Setcavage") issued a report for Plaintiff opining that Defendant's delay in investigating and evaluating Plaintiff's UIM claim failed to conform to industry standards, violated the Pennsylvania Unfair Insurance Practices Act, 40 Pa.C.S.A. §§ 1171.1 *et seq.*, and demonstrated a reckless disregard for the rights and interests of its insured.  (Doc. 39, p. 11 of 51.)

### B.   Procedural History

This case was originally filed in the Dauphin County Court of Common Pleas on May 31, 2013, but was removed to this court by Defendant on July 3, 2013, based on diversity of citizenship.  (Doc. 1.)  On July 31, 2014, Defendant filed the instant motion for partial summary judgment (Doc. 29), a supporting brief (Doc. 30), and a statement of material facts (Doc. 31).  The motion seeks judgment in favor of Defendant on Plaintiff's bad faith claim.  Plaintiffs filed an answer to the motion (Doc. 34), a brief in opposition (Doc. 36), an answer to the statement of material facts (Doc. 35), and a counter-statement of material facts (Doc. 37).  Defendant filed a reply brief (Doc. 45) and an answer to the counter-statement of material facts (Doc. 46) on September 8, 2014.  Thus, Defendant's motion for partial summary judgment is ripe for disposition.

## II.   Legal Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate when no genuine issue exists as to any material fact and when the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).  A fact is "material" if "proof of its existence or nonexistence would affect the outcome

of the lawsuit under the law applicable to the case." *Burke v. Transam Trucking*, *Inc.*, 605 F. Supp. 2d 647, 650 (M.D. Pa. 2009). An issue of material fact is genuine if "the evidence is such that a reasonable jury might return a verdict for the non-moving party." *Id.*

When considering a motion for summary judgment, a court must look beyond the pleadings and into the factual record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The nonmoving party may not merely restate allegations made in the pleadings or rely upon factually unsupported legal conclusions. *See id.* at 323–24. Instead, the nonmoving party must support each essential element of its claim with specific evidence from the record. *Id.* at 317. All factual doubts and reasonable inferences are to be resolved in favor of the nonmoving party. *Id.*

The moving party has the initial burden of proving that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (U.S. 1986). Once this burden is met, the burden shifts to the nonmoving party to produce evidence proving the existence of every essential element to its case. *Id.* The nonmoving party must then "go beyond the pleadings by way of affidavits, depositions . . . or the like in order to demonstrate specific material facts which give rise to a genuine issue." *Id.* at 324. In considering a motion for summary judgment, the court is not to engage in credibility determinations or the weighing of evidence. *Burke*, 605 F. Supp. 2d at 650. Instead, when the credibility of witnesses is at issue or when conflicting evidence must be weighed, a trial is needed. *Id.*

## III.        **Discussion**

Plaintiffs assert their claim for bad faith pursuant to 42 Pa.C.S.A. §

8371, which provides a statutory remedy for an insurer's bad faith conduct.  Section

8371 provides:

> In an action arising under an insurance policy, if the court
> finds that the insurer has acted in bad faith toward the
> insured, the court may take all of the following actions:
>
>> (1) Award interest on the amount of the claim from
>> the date the claim was made by the insured in an
>> amount equal to the prime rate of interest plus 3%.
>>
>> (2) Award punitive damages against the insurer.
>>
>> (3) Assess court costs and attorney fees against the
>> insurer.

42 Pa.C.S.A. § 8371 (1990).[3]

Bad faith claims "are fact specific and depend on the conduct of the

insurer *vis à vis* the insured." *Condio v. Erie Ins. Exch.*, 899 A.2d 1136, 1143 (Pa.

Super. Ct. 2006) (internal citations omitted).  Generally, to prevail on a bad faith

claim, "the plaintiff must show that the defendant did not have a reasonable basis for

denying benefits under the policy and that [the] defendant knew or recklessly

disregarded its lack of reasonable basis in denying the claim." *Terletsky v.*

*Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (citations

omitted); *see also Keefe v. Prudential Prop. & Cas. Ins. Co.*, 203 F. 3d 218, 225 (3d

Cir. 2005) (adopting the definition of bad faith as set forth in *Terletsky*).  A course of

action pursuant to Section 8371 is not limited to an insurer's bad faith in denying a

---

[3] The Pennsylvania Superior Court has noted that Pennsylvania's bad faith statute extends
to the handling of UIM claims. *Condio v. Erie Ins. Exch.*, 899 A.2d 1136, 1142 (Pa. Super. Ct. 2006)
(citing *Brown v. Progressive Ins. Co.*, 860 A.2d 493, 497 (Pa. Super. Ct. 2004)).

claim.  Rather, a plaintiff may also successfully assert an action for an insurer's bad faith in investigating a claim, *O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa. Super. Ct. 1999), such as a failure to conduct a reasonable investigation based upon available information, *Giangreco v. U.S. Life Ins. Co.*, 168 F. Supp. 2d 417, 423 (E.D. Pa. 2001), and failure to communicate with the claimant. *Romano v. Nationwide Mut. Fire Ins. Co.*, 646 A.2d 1228, 1232 (Pa. Super. Ct. 1994) (citing 3 Appleman, Ins. Law & Practice § 1612 (1967 & Supp. 1991)); *see also Johnson v. Progressive Ins. Co.*, 987 A.2d 781, 784 (Pa. Super. Ct. 2009).  Additionally, even when a claim is eventually paid, "[d]elay is a relevant factor in determining whether bad faith . . . occurred." *Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999) (citing *Klinger v. State Farm Mut. Auto Ins*. Co., 115 F.3d 230, 234 (3d Cir. 1997)).

        To constitute bad faith, it is not necessary that the insurer's conduct be fraudulent; however, "mere negligence or bad judgment is not bad faith." *Terletsky,* 649 A.2d at 688.  Instead, the plaintiff must show that the insurer breached its duty of good faith "through some motive of self-interest or ill-will." *Id.*  Significantly, there is a heightened burden of proof in bad faith claims, such that a plaintiff must demonstrate by "clear and convincing evidence" that an insurer acted in bad faith. *Id.* at 688.  The standard "requires a showing by the plaintiff[] that the evidence is so clear, direct, weighty[,] and convincing as to enable a clear conviction, without hesitation, about whether or not the defendant[] acted in bad faith." *Bostick v. ITT Hartford Grp., Inc*., 56 F. Supp. 2d 580, 587 (E.D. Pa. 1999) (citations omitted). Thus, to defeat a bad faith claim, an insurer need only show that it acted reasonably. For instance:

> The insurance company need not show that the process used to reach its conclusion was flawless or that its investigatory methods eliminated possibilities at odds with its conclusions. Rather, an insurance company simply must show that it conducted a review or investigation sufficiently thorough to yield a reasonable foundation for its action.

*Mann v. UNUM Life Ins. Co. of Am.*, No. 02-1346, 2003 WL 22917545, *7 (E.D. Pa. Nov, 23, 2003). Likewise, in bad faith claims involving "a long period of time between demand and settlement," the delay "does not, on its own, necessarily constitute bad faith." *Kosierowski,* 51 F.Supp. 2d at 588. Rather, a court should look "to the degree to which a defendant insurer knew that [it] had no reason to deny the [claim]; if [the] delay is attributable to the need to investigate further or even simple negligence, no bad faith has occurred." *Id*. at 588–89.

Applying these legal principles to the present case, Plaintiffs' bad faith claim must be dismissed. Although Defendant is not denying payment of Plaintiff's UIM claim, Plaintiffs contend that Defendant's delay in investigating and evaluating the UIM claim constitutes bad faith. Even when the evidence is viewed in the light most favorable to Plaintiffs, however, it is clear that Plaintiffs have failed to meet their burden of proving by clear and convincing evidence that Defendant acted in bad faith.

Plaintiffs fail to show that any delay in Defendant's investigation and evaluation of Plaintiff's UIM claim was motivated by self-interest or ill-will. Defendant did not know of a possible UIM claim until May 5, 2010, when Plaintiffs' counsel expressly discussed a potential UIM claim, but, at that time, Plaintiff did not definitively know whether such a claim would be necessary. On December 10, 2010, Defendant reviewed Plaintiff's medical payments file and noted that the date on

14

Plaintiff's last treatment bill was September 13, 2010, and that medicals records following Plaintiff's back surgery showed that the surgery had been successful, decreasing the likelihood of further medical care being required.  Because Defendant reasonably believed that a UIM claim would no longer be necessary, Defendant closed Plaintiff's file.  It was not until April 6, 2011, that Plaintiffs' counsel requested that a UIM adjuster be assigned.[4]  After a UIM adjuster was assigned, Defendant spent approximately two years collecting Plaintiff's medical records,[5] obtaining Plaintiff's statement under oath, arranging for a review of Plaintiff's medical records by an orthopedic surgeon, and completing its evaluation of Plaintiff's UIM claim.  Although two years may be a long period of time, a long period of time does not, on its own, constitute bad faith, and Plaintiffs fail to present evidence suggesting obfuscation, dishonesty, or malice.

Plaintiffs contend that Defendant acted in bad faith when it "questioned the causal relationship of [Plaintiff's] injuries to the motor vehicle accident" because Defendant had not questioned causality in Plaintiff's first party medical claim.  (Doc. 36, p. 7 of 23.)  However, Plaintiffs admit that a "payment of first party benefits does not, in and of itself, constitute an admission of causation" and that an insurer may deny UIM benefits after issuing payment of first party benefits.  *See Pantelis v. Erie*

---

[4]  Plaintiff contends that Defendant should have been aware of a potential UIM claim from September 6, 2009, the date when Plaintiff reported to Defendant that he had been involved in a motor vehicle accident.  (Doc. 36, pp. 6–7 of 23.)  However, Defendant had no way of realistically knowing until April 6, 2011, that Plaintiff would indeed require UIM benefits.  Prior to that time, Plaintiff himself was not even aware that UIM benefits would be necessary.

[5]  Medical records were especially important in this case because of Plaintiff's extensive history of medical ailments that predated the motor vehicle accident.  Therefore, Plaintiff's medical condition both pre- and post- accident needed to be established to identify what ailments were caused by the accident.

15

*Ins. Exch.*, 890 A.2d 1063, 1068 (Pa. Super. Ct. 2006) (holding that "an insurer's payment of first party benefits does not, without more, constitute a binding admission of causation"); *Thomer v. Allstate Ins. Co.*, 790 F. Supp. 2d 360, 373 (E.D. Pa. 2011) (adopting the holding of the *Pantelis* court). Therefore, Defendant was entitled to investigate in the UIM claim whether Plaintiff's injuries were caused by the motor vehicle accident even though Defendant had issued payment on Plaintiff's first party medical claim. Likewise, Defendant was entitled to investigate in the UIM claim whether Plaintiff was liable in any way for the motor vehicle accident even though Defendant had already issued payment on Plaintiff's first party medical claim. *See Glover v. State Farm Mut. Auto. Ins. Co.*, 950 A.2d 335, 337 (Pa. Super. Ct. 2008) (noting that "payment of first party benefits . . . is not an admission of liability"). Thus, Plaintiffs have not proved that any delay in investigating and evaluating Plaintiff's UIM claim was for a purpose other than the need for further investigation.

Furthermore, Defendant has proved that it acted reasonably under the circumstances. While its investigatory process may not be flawless, Defendant has proved that it conducted an investigation sufficiently thorough to yield a reasonable foundation for its action. If it had not collected Plaintiff's medical records, obtained Plaintiff's statement under oath, or arranged for a review of Plaintiff's medical records by an orthopedic surgeon, all of which took time to complete, Defendant would not have had the information it needed to conduct a thorough evaluation of Plaintiff's claim. No evidence exists that Defendant did not conduct its investigation in a reasonable manner, even if Defendant did not move as quickly as Plaintiffs would have liked or anticipate the possibility of a UIM claim even before Plaintiffs'

counsel notified of the claim.  Plaintiffs have thus failed to meet their burden of proving by evidence so clear, direct, weighty, and convincing as to enable a clear conviction, without hesitation, that Defendant acted in bad faith.  The court will grant judgment to Defendant on Plaintiffs' bad faith claim.

**IV.**        **Conclusion**

        For the foregoing reasons, Defendant's motion for partial summary judgment on Count II of the complaint will be granted.  An appropriate order will be issued.

                                                  s/Sylvia H. Rambo
                                                  United States District Judge

Dated:  October 20, 2014.

17